McKEE, Administrator of Estate of MELVINA BLANCHARD, Appellant, v. ALLEN et al., Executors of Will of JOSEPH BENOIST.

Division Two, June 11, 1907.

1. **EQUITY AND LAW: Difference: Remedy.** The Constitution secures to a defendant in an action at law the right of trial by jury. Therefore, the question whether a suit in equity or an action at law is the proper remedy, is one of substance.

2. ———: **Discovery of Assets: Meaning of Section 187.** Section 187, Revised Statutes 1899, providing that all actions commenced against the administrator, after the death of deceased, "shall be considered demands legally exhibited against such estate from the time of serving the original process against such administrator," has reference to the time when demands shall be considered exhibited within the meaning of section 185, and is not authority for holding that a bill of equity is the proper proceeding to discover assets in the hands of deceased at his death and to obtain an allowance or a money judgment against his executor for the amounts of these assets.

3. ———: ———: **By Administrator: Money Judgment: Trust Fund.** Plaintiff sues in his representative capacity as administrator of the estate of a sister of defendant's testator, and charges that said testator received in his lifetime moneys of his said sister and loaned and otherwise invested them for her to the amount of many thousands of dollars, which, together with the increase, plaintiff believes amounted to forty thousand dollars, and that the same remained in the hands of said testator at the time of his death, and the prayer is that his executor be required to pay over said sums with interest. Plaintiff did not sue as an heir or a devisee of an alleged beneficiary (the sister) entitled to have a decree of title to specific property, nor does he seek to pursue a trust fund into any specific property, but the purpose of his bill is to obtain an allowance in the form of a money judgment against the said executor;

nor was the evidence directed to a discovery of assets, and all the evidence offered could have been introduced in an action at law upon a demand, under the statutes against the estate of said testator, in the probate court; and the small number of items did not call for an accounting or reference. *Held*, that plaintiff had a complete and adequate remedy at law, and it was not necessary to have invoked the aid of a court of equity in order to obtain full relief.

4. **TRUST: In Notes.** A trust in notes cannot be declared upon the isolated fact that the lender and owner of the money caused them to be made to his sister as payee. To constitute a trust there must be an explicit declaration of the trust, or circumstances that show beyond a reasonable doubt that a trust was intended to be created.

5. ————: ————: **Carrying Property in Sister's Name.** The testator's wife and children were dead, and he had been thrifty, and had employed his favorite sister's husband in his business, and after his death and her return to Canada, he bought real estate with his own money, and took the title in her name, and loaned money on real estate, and took the notes in her name, and the deeds of trust in his name as trustee and hers as beneficiary, and took from her a general power of attorney, and just before her death she assigned to him by a general assignment the various notes which were in her name, the notes at all times remaining in his possession. At various times he sent her money, mostly in reply to requests from her, and for that she again and again expressed her gratitude, and there is nothing to indicate that she considered he owed her money or had in his possession any money belonging to her, but all her letters bear the unmistakable stamp that she regarded these remittances as gifts to help her support and educate her children. At one time he stated in her presence that she had forty-five thousand dollars to divide among her children, and he made a will naming her as a legatee, but she died first, and he changed his will, and lived five years after her death, and no effort was made by her children or heirs or administrator to collect anything from him during his life. *Held*, that no trust in favor of her administrator against his estate could be declared upon this showing.

6. ————: **Evidence: Fragment of Letter.** A fragment of a letter, signed by testator, in which he says that "in case I should die suddenly, you may write to" a certain person, "and he would give you the information to help you recover your moneys I have lent in your name, and which to-day amount to over twenty thousand dollars," no date being given, and there being no showing as to whom it was addressed or written, or what the contract was, is not competent as going to establish a trust.

It is not the case of an accidentally defaced paper, nor one where when a portion of a complete instrument is offered in evidence the opposite party has the privilege of offering the balance if he desires, for there was no evidence that any person had ever seen the complete writing.

Appeal from Jackson Circuit Court.—*Hon. James Gibson,* Judge.

AFFIRMED.

*Ellis, Cook & Ellis* for appellant.

(1) Plaintiff's Exhibits 'O'' and ''P,'' incomplete letters from Benoist to Mrs. Blanchard, were admissible in evidence. They were complete in so far as the topics referred to were concerned. 1 Wharton, Ev. (2 Ed.), sec. 63; 1 Greenleaf, Ev. (13 Ed.), sec. 566; Addis v. Graham, 88 Mo. 202; Lee v. Alexander, 9 B. Mon. 25. (2) Suit in equity was appropriate proceeding to enforce claim of the plaintiff. R. S. 1899, sec. 187; Butler v. Lawson, 72 Mo. 245; Estate of Glover, 127 Mo. 164; Leeper v. Taylor, 111 Mo. 321; Tufts v. Latshaw, 172 Mo. 367; Seymour v. Freer, 8 Wall. 214; 1 Pomeroy, Equity, sec. 151; Wernse v. McPike, 100 Mo. 476. (3) Benoist was trustee of an express trust. A trust in personalty may be established by parol evidence and parol admissions. These, when coupled with written statements and unequivocal acts, constitute conclusive proof of the trust. Harris Banking Co. v. Miller, 190 Mo. 664; 1 Perry, Trusts (3 Ed.), sec. 86, p. 76; 2 Pom. Equity, sec. 998, p. 552, note 1; 2 Pom. Equity, sec. 1008; 1 Beach, Trusts, sec. 51; 28 Am. and Eng. Ency. Law (2 Ed.), 870, citing cases from England and nearly all the States. (4) No set form of words is necessary to create a trust. Benoist's sworn admissions and the statements in his letters that he held his sister's money and loaned it

for her and the fact he held power of attorney from her to handle her affairs and his parol admissions as to the amount of money in his hands belonging to her, established him as trustee of an express trust. Harris Banking Co. v. Miller, 190 Mo. 668; In re Soulard, 141 Mo. 664; 1 Perry, Trusts (3 Ed.), sec. 82; 28 Am. and Eng. Ency. Law (2 Ed.), 866; Ray v. Simmons, 11 R. I. 268; Lane v. Ewing, 31 Mo. 86; Clapp v. Emery, 98 Ill. 523; Beaver v. Beaver, 117 N. Y. 428; Bispham, Equity (4 Ed.), sec. 71. (5) Taking deeds of trust to Benoist as trustee to secure notes payable to Melvina Blanchard and placing the same on record established the trust as to those specific loans and fixed Mrs. Blanchard's right as beneficiary; recording the deeds of trust was confirmatory and equivalent to a delivery to her. Harris Banking Co. v. Miller, 190 Mo. 640; Feary v. O'Neill, 149 Mo. 467; Brooks v. Marbury, 11 Wheat. 97; Cunningham v. Freeborn, 11 Wend. 240; In re Soulard, 141 Mo. 662. (6) Even though Melvina Blanchard had had no property nor money of her own in Benoist's hands, still Benoist's own declarations, oral and written, made voluntarily and without other consideration, were sufficient to constitute himself trustee of his own property for the benefit of Mrs. Blanchard; and once created such a trust is valid and enforceable in equity. Harris Banking Co. v. Miller, 190 Mo. 671; In re Soulard, 141 Mo. 662; Leeper v. Taylor, 111 Mo. 312; 1 Perry, Trusts (3 Ed.), sec. 104; 28 Am. and Eng. Ency. Law (2 Ed.), 890, note 2; Bispham's Equity (4 Ed.), sec. 67; Willis v. Smyth, 91 N. Y. 297; Milholland v. Whelan, 89 Md. 212; Booth v. Bank, 122 Cal. 25; Bank v. Schwoon, 63 N. J. Eq. 503; Bath Sav. Inst. v. Hathorn, 88 Me. 122; Sayre v. Weil, 94 Ala. 466; Atkinson's Petition, 16 R. I. 413; Gaffney's Estate, 146 Pa. St. 49; Smith's Estate, 144 Pa. St. 428; Blasdel v. Locke, 52 N. H. 238; Bank v. Albee, 64 Vt. 571.

*C. O. Tichenor, Allen & Allen, F. P. Sebree* and *Johnson & Lucas* for respondents.

(1) The circuit court had no jurisdiction to entertain a bill in equity for the discovery of assets. The proceeding should have been in the probate court, and discoveries of evidence parol and documentary could have been made by deposition. Claves v. Wood, 87 Mo. App. 97; Larimore v. Bobb, 114 Mo. 453. (2) The petition is not good as a bill in equity, because it fails to aver, or to show on its face by statement of facts that plaintiff has no adequate remedy at law; but in fact shows by its averment of the specific sum due, that he had an action at law. Eck v. Hatcher, 58 Mo. 235; Humphrey v. Milling Co., 98 Mo. 552; Gotcher v. Hoefner, 107 Mo. 270; Verdin v. St. Louis, 131 Mo. 105; Mathews v. Railroad, 142 Mo. 645; Benton Co. v. Morgan, 163 Mo. 661; Church v. Church, 73 Mo. App. 421; Wells & Wiggins v. Clark's Ex., 79 Mo. App. 401. (3) Defendant was not required to plead the assignment of securities from Melvina Blanchard to Joseph Benoist. Mussman v. Zeller, 108 Mo. App. 348; Jones v. Rush, 156 Mo. 364. (4) The assignment of securities by Melvina Blanchard was valid, because regularly executed, acknowledged and delivered, and because the securities assigned were in possession of Benoist at the time of the assignment. Lanier v. McIntosh, 117 Mo. 516; State ex rel. v. Jones, 131 Mo. 207; McFadin v. Catron, 138 Mo. 224; Becht v. Becht, 168 Mo. 530; Fitzpatrick v. Weber, 168 Mo. 574; Lowry v. Danforth, 95 Mo. App. 451. (5) No express trust is alleged in the petition, and neither an express nor an implied trust was proven. Williard v. Williard, 56 Pa. St. 125; Savings Inst. v. Hathorn, 88 Me. 127; Young v. Young, 80 N. Y. 436; Phillippi v. Phillippi, 115 U. S. 151; Reed v. Painter, 129 Mo. 682; Curd v. Brown, 148 Mo. 92; Pitts v. Weakley, 155 Mo. 109.

GANTT, J.—This is a bill in equity by the administrator of the estate of Mrs. Melvina Blanchard against the administrator *pendente lite* of the estate of Joseph Benoist for an accounting of assets and moneys alleged to have belonged to Mrs. Blanchard in her life time to the amount of forty thousand dollars, which, it is charged, were entrusted to the said Benoist by Mrs. Blanchard, and of which no accounting had ever been made by said Benoist to her in her life time. Plaintiff alleges that he was appointed administrator of the estate of Mrs. Blanchard by the probate court of Jackson county, on March 18, 1901, and that Mrs. Blanchard died intestate at Kansas City, February 9, 1894. The defendant was the administrator *pendente lite* during the contest of the will of Joseph Benoist, deceased, who died August 16, 1899. The petition then alleges that Mrs. Blanchard was a sister of Joseph Benoist, and they were both born in the French settlement near Montreal, Canada, and were reared as Canadian French; that said Benoist emigrated in early manhood to the United States, but his said sister remained in Canada and was there married to one Joseph Blanchard; that in the early part of the year 1868 said Melvina Blanchard and her husband came from Canada and joined said Benoist at Baxter Springs, Kansas, where said parties, working and co-operating together, began and developed a large and profitable merchandise business and jointly accumulated a large amount of property; that said Joseph Blanchard died in the early part of the year 1877, and that thereupon Mrs. Blanchard took her three children and her household effects and returned to Canada, leaving her property in the custody and control of said Benoist, who was authorized by her to, and who did continuously thereafter sell, invest and handle the same for her; that for many years he loaned and handled the money and property of Mrs. Blanchard for her benefit and she

trusted him implicitly with her affairs; that she was a person of small business experience herself, while said Benoist was a shrewd and successful business man; that Mrs. Blanchard a few months prior to her death came from Canada to Kansas City, Missouri, to live with her brother the said Benoist, and they lived together in the fall of 1893, until her death in February, 1894; that the letters, memoranda, receipts and other papers belonging to Mrs. Blanchard relating to her business transactions with said Benoist were, as plaintiff is informed and believes, then at the time of her death in her control in Kansas City, Missouri, and after her death the same fell into the hands of said Benoist, or were lost or destroyed; that because thereof plaintiff is unable at this time to state the amount of the moneys and property and the items thereof, so by said Melvina Blanchard entrusted to said Benoist, or the dates when the same were so placed with him or the fashion in which the same were invested, but that between the first day of January, 1868, and the first day of March, 1894, the money and property so entrusted by her with said Benoist for investment aggregated many thousands of dollars; that the same, together with the increase thereof, remained in the hands of said Benoist, were by him collected and the same, or the proceeds thereof, were among the assets held by said Benoist at his death, and devolved upon the defendant by virtue of his appointment as administrator *pendente lite;* that the total value of the moneys and property belonging to said Mrs. Blanchard so entrusted by her to said Benoist, amounted at the time of his death to forty thousand dollars.

To this petition the defendant answered, first, that he denied each and every allegation contained in the petition, and, second, that the cause of action, if any, alleged by plaintiff did not accrue to him or to his intestate within five years next before the filing

of this petition, and having fully answered, defendant asks to be discharged with his costs. Plaintiff filed a reply denying each and every allegation of new matter.

On the trial of the cause, the plaintiff, McKee, was sworn as a witness and exhibited his letters of administration, dated March 18, 1901. He then testified that he had none of the original mortgages or deeds or notes or title papers pertaining to the estate of Mrs. Melvina Blanchard, and had never had the custody of any of these papers. It was admitted that the defendant, Thomas J. Seehorn, was the duly appointed administrator *pendente lite* of the estate of Joseph Benoist, deceased; that said Benoist died, leaving a will, and under that will A. M. Allen, Thomas McNamara and Daniel O'Flaherty were appointed executors of the said will, and that subsequently a suit was instituted contesting said will, and by virtue of that suit and because thereof the defendant Seehorn was appointed administrator *pendente lite,* and the estate of said Benoist passed into his control and possession. Plaintiff then introduced in evidence the original inventory of the estate of said Benoist, consisting of real estate and personal property, consisting mostly of notes secured by deeds of trust, amounting in the aggregate to $76,311.13. On cross-examination the witness stated that he had never made any inventory of Mrs. Blanchard's estate, but had been guided in all the proceedings by his attorney who brought this suit. If there was any inventory, he presumes that he was sworn to it, but he had no recollection of who the witnesses were to the said inventory.

The defendant Seehorn was then sworn as a witness for the plaintiff and testified that there were in his hands at that time, notes, Government bonds and cash amounting to eighty-two thousand dollars, and aside from that there were four pieces of real estate

which had never been appraised, but a general estimate of its value would be about thirty thousand dollars. He was then asked if he could tell which of the notes that were inventoried were payable to the order of Melvina Blanchard. Answered that he could not, that most of the notes had been paid, that the Elfedt note still remained in his hands, but it seemed to him that on one of the notes there was the signature of Mrs. Blanchard. The plaintiff introduced in evidence the records from the recorder's office showing eight or ten deeds of trust from different parties to Benoist, as trustee, in which Mrs. Blanchard was named as a party of the third part or beneficiary. These deeds of trust secured notes amounting to about thirty thousand dollars and the said deeds except one or two were all shown by the said records to have been satisfied either by Benoist as assignee of the notes or his administrator or executors.

The plaintiff offered evidence that in August, 1890, a suit was begun in the circuit court of Kansas City, in which Homer Reed was plaintiff and Joseph Benoist and Melvina Blanchard were defendants. In that suit the inquiry arose whether Benoist was loaning out his own or Mrs. Blanchard's money in Mrs. Blanchard's name. Benoist's deposition was taken and he was questioned upon that point, and among other questions the following were propounded and answered by him as follows: "Q. Now, Mr. Benoist, was that your money or Mrs. Blanchard's money? A. It was Mrs. Blanchard's money. Q. Is this Mrs. Blanchard a person of means? A. I believe she is. Q. From whom did she get her money? A. She had some money from her father's estate, I am not positive about that. I do not know where she got her money originally. Q. Now as a matter of fact, Mr. Benoist, are not you loaning your own money in Mrs. Blanchard's name? A. I am not; I am paying interest on money

instead of that.  I can show you receipts for years,
I am paying interest on good money.''  In that same
case, Benoist himself was a witness and testified as
follows: ''Q.  You have had charge for a number of
years of Mrs. Blanchard's property?  A.  Yes, sir.
Q.  Did you have charge of Blanchard's property
after his death?  A.  Yes, sir.  Q.  Have you still
charge of that property?  A.  It is about all sold.  I
could not say now, I think it is all disposed of, I mean
by that, the real estate.  Q.  Has there been any ad-
ministration of the estate of Mr. Blanchard?  A.  No,
sir.  Q.  No administration upon it?  A.  No, sir.  Q.
And you had charge of Mrs. Blanchard's property,
and Mrs. Bissonnette's property here?  A.  Yes, sir,
Mrs. Bissonnette has not had anything here, but Mrs.
Blanchard has since 1868.  Q.  How much property
did Mr. Blanchard leave?  What time did he die?  A.
I could not say just what time without looking back,
it was twenty years ago.''  In that same suit, Mrs.
Blanchard's deposition was taken at Montreal, in
1891, where she then lived.  Benoist had written her
telling her what her testimony should cover and indi-
cating very clearly how she should testify in order to
show that she was in fact the owner of the deed of
trust which Mr. Reed was seeking to make subsequent
to his own.  Her deposition indicates that she followed
his instructions, but after reading the letter of instruc-
tions given her by her brother, one is not very much im-
pressed with the view that she really had any title to
the note and deed of trust, but that, in fact, Benoist
was the owner of the note and deed of trust and was
resorting to this method in order to maintain his pri-
ority over Reed's mortgage.  In that deposition, how-
ever, of Mrs. Blanchard's, she testified that she had
business in Kansas City, and that her brother acted
for her; that she had lived in Kansas City during her
husband's lifetime, and after his death, her brother

has acted for her. She testified further that she had her husband were in partnership with Benoist, that is to say, "we were not formally in partnership, we were working together. My husband left some properties when he died and my brother took charge of my affairs ever since." She testified also that she gave him a full power of attorney after the death of her husband. When asked how much money she ever sent Benoist to lend for her, she answered, she could not say, that he had sent her money, and as she could not lend it advantageously she had sent it back to him, and she could not state whether she sent in one or more letters. When she needed money, she addressed herself to him and he sent her some; that they had never had a regular settlement or division.

The plaintiff offered in evidence what purported to be a fragment of a letter written by Joseph Benoist which the court excluded. That paper reads as follows: "There is here a Canadian by the name of Remi Adolphe Magnan. I have known him for eight or nine years. He is a brave and honest man, a gentleman and honest above all. Should I happen to die suddenly, you may write to him and he would give you the information to help you recover your moneys I have lent in your name, and which to-day amount to over twenty thousand dollars. Signed Joseph Benoist." The exclusion of this particular piece of testimony was made the ground of exception by the plaintiff. Magnan was shown to have died before this suit was begun.

In September, 1878, Benoist wrote to Mrs. Blanchard and in his letter said: "With regard to your money, you may do as you please, it is your business, six per cent is a rather small interest, but it is better than to have a promise of a higher rate and to be troubled in getting it. I will not send you any money be-

fore my buildings are completed, because I may be short of money.''

Plaintiff offered in evidence an ante-nuptial contract between Joseph Blanchard and Mrs. Melvina Blanchard by which the property of both went to the survivor thereof at the death of either.

There was other evidence in the nature of statements and admissions in writing and oral by Benoist, tending to show that he had money of Mrs. Blanchard's which he was investing for her, but the amount thereof was not shown by such statements. The evidence on the part of the plaintiff tends to show that Mrs. Blanchard was a half-sister of Joseph Benoist and they were both born in a French settlement in Canada, from which place Benoist emigrated to the United States in youth. Mrs. Blanchard was married to her husband in the year 1860. They were people of the laboring class with small properties. Prior to 1868, Benoist had settled at Baxter Springs, Kansas, and had established a mercantile business there, which prospered very greatly under his management. In 1868, it would seem at his suggestion, Mr. and Mrs. Blanchard sold their home in Canada and went to live with Benoist at Baxter Springs. The business at Baxter Springs was all in Benoist's name and Mr. Darnall, a witness, who clerked for Benoist at that time, testified that he knew Benoist and Mr. and Mrs. Blanchard well and that he had never heard of anybody being interested in that business except Benoist himself. That Mr. and Mrs. Blanchard stated to him that they were dissatisfied there and Blanchard stated that he was working for wages for Benoist. Indeed, on the subject of Benoist ownership of that mercantile business, there is no substantial evidence that anyone else had any interest in it except Benoist himself. Blanchard brought with him from Canada about five hundred dollars in money, which he gave to Benoist for safe-keeping. In 1870,

Blanchard returned to St. Charles, Canada, Benoist having returned to him five hundred dollars and furnished him transportation for himself and family. In 1872, Blanchard returned to Baxter Springs with his wife and daughter, Azama, but without any money. From that time until his death in February, 1877, Benoist furnished to Blanchard and his wife and daughter a comfortable home, with horses, buggy, cows, implements, garden, etc., and Benoist took his meals with them, but slept in a room over his store. The store and the money drawer were open to Blanchard and his wife and Blanchard worked for Benoist, but during the last few years of his life, he was a confirmed invalid. A son was born to Mr. and Mrs. Blanchard in 1876 and named Joseph. Shortly after Blanchard's death in 1877, Benoist closed out his business at Baxter Springs, and advised Mrs. Blanchard to return to her husband's and her own people in Canada. He provided her with railroad tickets to Montreal and money to pay her traveling expenses and packed and shipped her personal effects and such household goods as she desired. Subsequently he sent her money with which she bought a home in a village near Montreal and lived there until 1882. She and Benoist corresponded at intervals from 1877 until 1893. The evidence also tended to prove that Benoist transacted a large part of his business in the purchase of real estate and in the taking of notes and mortgages in Mrs. Blanchard's name. The evidence on both sides is quite clear that Mrs. Blanchard did not act or live like one who had property to any considerable amount. She lived in her little cottage near Montreal, did all of her work, including her washing. She promised to pay Bissonnette upon his marriage to her daughter, one thousand dollars, and this she afterwards did by investing it in a home for her daughter in Montreal. At that time she had about three thousand dollars in the Bishops'

Bank. She also promised to pay Roy, her other son-in-law, one thousand dollars when he married her other daughter, but she never did, although the evidence shows that Roy was a poor man working in a butcher shop, and his wife was doing all the work of the house-keeping. Mrs. Blanchard broke up her housekeeping and sold her little place and put the money into the Bishops' Bank, which left her about twenty-four hundred dollars, and she then went to live with Bissonnette, and worked in the housekeeping, but never paid any board, although Mrs. Bissonnette swore in court on a trial in Montreal, that Mrs. Blanchard owed her seven hundred dollars for board which she never paid. In the numerous letters written by Mrs. Blanchard to Benoist, there are many acknowledgments of the receipts of moneys by her from him. In November, 1877, she acknowledged the receipt of five hundred dollars which he had sent her. In January, 1878, he sent her one thousand dollars, and in her letter acknowledging it, she says it shows his kindness for her. In 1878, a deed of conveyance was made from Howenstein, re-ceiver, to Melvina Blanchard to certain real estate in Jackson county for $3,686.27, and in the following November Mrs. Blanchard made a general power of attorney to Joseph Benoist empowering him to lend, let, mortgage, encumber, sell or demise said real estate in the State of Missouri and Kansas. In a letter of September 29, 1878, the one in which he told her she could loan her money as she pleased, he added this post-script, "I send you herewith a document, which you will kindly sign, and have it testified by a clerk or other officer, who has a seal same as the one I sent you a year or so ago. The properties I have here are in your name and this document is to authorize me to act as your agent." This document was evidently the power of attorney already referred to. In December, 1879, she wrote acknowledging the receipt of ten dol-

lars and saying, "I am well pleased and I thank you much." In that letter she asked him to let her decide to have one of her daughters take music, saying it would cost twenty dollars a, year and then adds, "The payment which I have to make is of eighty-four dollars in the beginning of January. If you could let me have the money to pay, I would be much pleased." On January 6, 1880, she wrote: "I hasten to write to you to tell you I have just received your letter with two fifty dollars, which were in it. I thank you a thousand times for your kindness and I am glad to learn that you are a little better." On the 28th of January, 1880, she wrote him telling him of her daughter's financial distress, and says, "I beg you in mercy to be willing to protect her in this moment. The good God will return it to you. It is a charity if you can give her twenty-five dollars." In her next letter referring to the education of her daughter Azama: "I should be glad to have the means for her instruction if you are willing. I have received your letter with the twenty dollars." On August 31, 1880, she wrote that she would like to have her daughter study music and said, "You will tell me if you are not willing, as by myself my means would not allow it to me." And in December of the same year, she wrote him that she was obliged to have her kitchen repaired and it would cost twenty dollars, and said, "If you could help me a little I would be very much pleased." On the 9th of January thereafter she acknowledged the receipt of fifty dollars from him and said, "It has been hard for me to ask help from you. I know you have always been good to me. A thousand thanks for your kindness. I will never forget you." On November 13, 1881, Mrs. Blanchard wrote Benoist acknowledging the receipt of twenty dollars and saying, "I am much pleased. I paid ten dollars to the Sisters, who said they were in much need of it. I could not pay them sooner as I had no money.

I dressed the little girl for winter. I am through with every thing which I have carried from Baxter — that brought me this far. I make no needless expenses, I have as much as possible. The money goes quickly. I should be glad if you could come and judge for yourself. A thousand thanks for your kindness.'' On March 12, 1882, she acknowledged the receipt of twenty dollars and referred to some complaint of his that her expenses were too high. Mentioned the time they had been separated and says, ''I never spend a day without thinking of you. I think very often that I am not sure to see again that good brother who takes the place of a father to my children. I thank the good Lord every day to have you as a protector.'' About this time Mrs. Blanchard sold her property in Beloiel and removed to Montreal.

In 1883, Benoist was building houses in Kansas City, and on January 1, 1884, he borrowed one thousand dollars from Mrs. Blanchard, paying her six per cent interest in advance. The interest he paid her semiannually in advance, and in November, 1891, he paid the note itself. On September 12, 1885, there was filed for record in Jackson county, Missouri, a conveyance dated and acknowledged March 12, 1881, from Melvina Blanchard to Joseph Benoist for the express consideration of twenty-five thousand dollars for the real estate conveyed to her in the three deeds filed July 6, 1878, February 24, 1880, and November 25, 1880.

In January, 1887, Azama Blanchard, the daughter of Melvina Blanchard, married F. X. Bissonnette, and on March 7 of that year Mrs. Blanchard wrote Benoist as follows: ''I hasten to answer your letter of the 27th, which I have just received with the bill enclosed. Thousand thanks for your kindness. . . . Perhaps you are going to blame me for giving one thousand dollars to Azama to buy one side of a house of two lodgings, one for themselves and the other to be let

for eight dollars per month. It cost her one thousand, six hundred dollars. I did it with good intentions. Since you have asked me if I wished to enjoy it when they were all large or after my death. The one thousand dollars which you were willing to give her, can be kept by you for me to reimburse what I gave her. The six hundred dollars I loaned for three years at the same interest five per cent as they were placed, four hundred only remained at the Bishopric at five. I hope that you are not going to be angry, that you are going to retain the same amount to me since you were willing to give them to her, that will reimburse me later.''

On March 4, 1889, Cazilde, the other daughter of Melvina Blanchard married Joseph Henry Roy.

On the 19th of March, 1889, Benoist loaned one thousand dollars to Enoch G. Dawson and Martha Dawson, his wife, and took their note for the same, payable in five years to Melvina Blanchard and secured by deed of trust to himself as trustee, this being the same note over which he had the litigation with Reed as to his priority. On December 27, 1889, Benoist wrote Mrs. Blanchard: ''I send you herewith seventy dollars; for the interest on my note for one thousand dollars to the first of July, thirty dollars; for your incidental expenses to the first of May, forty dollars. I also enclose you three insurance policies, which you will kindly sign where I have made the pencil marks. You will put them in an envelope which I also send you, and stamp it sufficiently that it will reach me safely. The properties upon which these policies were issued were in your name and when you transferred them to me, the policies became valueless unless they were transferred to the purchaser. I have neglected to send them before, but if the buildings happen to burn, I would have difficulty to collect the insurance.'' On February 22, 1891, Mrs. Blanchard wrote to Ben-

oist: "Azama wrote to you that she did not know where I had taken (should be gotten) the one thousand dollars, which I gave her on the marriage, she knows if I had not had them here I could not have given them to her at the same time I lent her the six hundred dollars before her marriage. She saw always the letters you sent me since she is married, and the money which you sent me." Then she adds in the same letter, "that makes a hundred and fifty dollars, which I have given them in hand in three and one-half years. I did not wish to give more. I have always worked for my board very justly."

Benoist visited in Canada in August, 1891, and the witnesses for the plaintiff, Mrs. Archambault and Roy, the sister and son-in-law of Mrs. Blanchard, testified that at a certain family dinner party while he was there, Benoist stated that Mrs. Blanchard was certain to have fifteen thousand dollars for each of her children, that she was rich, and that her money was at the Friars in St. Louis, and she would have no trouble to get it. When Benoist returned from Canada in 1891, he brought Mrs. Blanchard with him to Kansas City and he furnished a house for her there, but she concluded to return to Montreal in November of that year. He furnished her with her railroad ticket and money to pay her note of one thousand dollars and interest. Benoist at that time was sending the boy, Joseph Blanchard, to school in St. Louis, and in the summer of 1892, he ordered Joseph back to his mother at Montreal. Mrs. Blanchard wrote him: "I am very sorry to learn that you have ordered the brothers to send Joseph away without knowing why. If he has done something wrong, I implore you in remembrance of his father and for me, give him the charity to permit him to graduate so that he could have got certificates and be placed by the brothers to make his living. . . . Dear brother, I beg your

pardon, be willing to help him through charity. You have always been very good and you will be still." Again that fall she writes: "It is the greatest punishment I can have in the world to see him in the sad position in which he finds himself. I cannot abandon him. He must eat and be dressed. I recommended myself to you imploring your help. You have always been good and I hope you are going to help me." In July, 1893, Mrs. Blanchard and her son Joseph returned to Kansas City and were established in a residence of Benoist's at Thirty-fifth and Genesee streets, and Joseph was put at school at the Christian Brothers. In November, 1893, Mrs. Blanchard became ill, and was sent to the Girls' Orphan Asylum in Kansas City; while there, on the 24th of January, 1894, she executed, acknowledged and delivered an assignment of all the mortgages then standing in her name to Benoist. This assignment recites that she held these mortgages for the convenience of herself and Benoist with a conditional right in them in case she survived him. She died February 9, 1894. As already said, this action is brought to establish a trust on behalf of Mrs. Blanchard's estate against the estate of Benoist to the amount of forty thousand dollars, on the claim that the various properties conveyed from time to time to Mrs. Blanchard, and afterwards conveyed by her to Benoist, and the various notes taken in her name and by her assigned to him before her death, were in fact her properties and not his. The circuit court found for the defendant, and dismissed the plaintiff's bill, and rendered its decree accordingly. And from that decree the plaintiff appeals.

I. That the plaintiff seeks relief in equity or a discovery of assets, and to have those assets decreed to the plaintiff, both sides agree. The plaintiff insists that a suit in equity is the appropriate proceeding to

enforce the claim of the plaintiff. On the contrary, it is insisted by the defendant that the plaintiff has an adequate remedy at law if the facts which he states are true, by presenting a claim for money received by Benoist in his life time and owing by his estate to the plaintiff as administrator of Mrs. Blanchard. The question whether a suit in equity or an action at law is the proper remedy, is one of substance under our Constitution, which secures to a defendant, in an action at law, the right of trial by jury. This has often been pointed out by the appellate courts of this State. Thus, in Humphreys v. Atlantic Milling Company, 98 Mo. l. c. 548, Judge Black, speaking for this court, said: "The general rule is that a creditor, before he can maintain a creditor's bill, must show that he has exhausted all remedy at law; and this because a court of equity will not entertain such a suit where the plaintiff has a complete and adequate remedy at law. . . . The distinction between suits in equity and actions at law, so far as the trial is concerned, must be maintained, so long as parties have a constitutional right to a trial by a jury in actions at law." And in Benton County v. Morgan, 163 Mo. l. c. 679, it was said by this court: "There is, however, an insurmountable objection to the plaintiff's petition, and upon that ground, if no other, the demurrer was properly sustained; and that is, that plaintiff, admitting all of the allegations in the petition to be true, has a complete and adequate remedy at law for the injury sustained." [See, also, Planet P. & F. Co. v. Railroad, 115 Mo. l. c. 619; Walker v. Railroad, 57 Mo. 275; Grocery Co. v. Clark's Ex., 79 Mo. App. 405; Church v. Church, 73 Mo. App. 421; Glaves v. Wood, 87 Mo. App. 92.]

Plaintiff, however, relies upon section 187, Revised Statutes 1899, which provides: "All actions commenced against such executor or administrator, after

death of the deceased, shall be considered demands legally exhibited against such estate from the time of serving the original process on such executor or administrator.'' This section, however, simply has reference to the time when claims and demands shall be considered exhibited within the meaning of section 185, Revised Statutes 1899, which provides that all claims shall be exhibited within two years, saving certain disabilities, and is not authority for holding that a bill in equity is the proper proceeding to obtain an allowance for a money judgment. In Butler v. Lawson, 72 Mo. l. c. 245, this court repeated what it had previously said, that the jurisdiction of probate courts in this State does not extend over matters of purely equitable cognizance. Speaking of the facts in that particular case, it was said: ''This is no case of a demand against an estate for the debt of the decedent, where the allowance of that demand would be followed in usual course by an order for the sale of the lands for the payment of the debt, and where, of course, the remedy at law being amply efficacious would constitute an insuperable obstacle to equitable interposition, but a case where the beneficiaries, the pursuers of the trust fund, may, upon sufficient evidence of the conversion of that fund into certain specific property, elect to take the property itself.'' Whereas, in this case, the plaintiff himself sues simply in his representative capacity as administrator and not as an heir or devisee of an alleged beneficiary and entitled to have a decree of title to specific property, but more than that, the petition proceeds to state that the deceased, Joseph Benoist, received the moneys of Mrs. Melvina Blanchard and loaned and invested the same for her to the amount of many thousand dollars, and that the same, together with the increase thereof, remained in his hands at the time of his death; that the total amount of the

said moneys and property at the time of the death of said Benoist was forty thousand dollars, and there was a prayer that the defendant, as administrator of the said Benoist, be required to pay over to plaintiff the said sum with interest. Applying the rule announced in Butler v. Lawson, supra, this is a case of a demand against the estate for a debt of the decedent, Benoist, where the allowance of that payment would be followed in the usual course by the administrator or executors of said Benoist satisfying the same out of the personal estate and if that should be insufficient then resorting to an order for the sale of lands for the payment thereof. This is a case in which the plaintiff is not seeking to pursue a trust fund into any specific property. On the contrary, the allegations of the petition amount to no more than that the deceased Benoist in his lifetime had and received moneys belonging to Mrs. Blanchard, which he had not paid over or accounted for during her life, and that her administrator, the plaintiff herein, is entitled to recover the same to the amount of forty thousand dollars. Counsel also cite us to Leeper v. Taylor, 111 Mo. 312. In that case the petition set out a declaration of trust by the defendant of certain real estate for the benefit of his father and mother, and that this trust had been kept secret from Mrs. Taylor by the fraud of the defendant, and the purpose of the bill was to require the defendant, as the trustee of an express trust, to account for the use of the trust property There can be no doubt that a suit in equity can be maintained in those cases where fiduciary relations exist between the parties and the duty rests upon the defendant to render an account. Moreover, in Leeper v. Taylor the answer itself prayed to have the declaration of trust canceled, and that of itself invoked the powers of a court of equity. The case of Est. of Glover & Shepley, 127 Mo. 153, was simply an appeal

from a settlement between a removed administrator and his successor and involved only the credits which should be allowed the removed administrator, and it was simply ruled that certain equities, which the removed administrator claimed, would not be allowed in that proceeding, to-wit, an appeal from the judgment of the probate court, because the probate court had no equitable powers, and that case does not aid us in the determination of the point now before us. Tufts v. Latshaw, 172 Mo. 359, involved the settlement of a partnership estate in which a surviving partner made an assignment of the partnership assets, and the administrator of the partnership estate sought a decree against the assignee for all the funds which he held as such. The case throws no light whatever upon the question now under consideration.

Neither does the case of Wernse v. McPike, 100 Mo. 476. The evidence introduced by the plaintiff was not directed to any discovery of assets. The court was not asked to require the defendant to produce any undisclosed evidence. The testimony on behalf of the plaintiff was apparently entirely under his control. It consisted of the evidence of the two sons-in-law of Mrs. Blanchard, Bissonnette and Roy, and of the deposition of Mrs. Archanbault, a half-sister of Mrs. Blanchard, tending to show admissions of Benoist of the possession by him of property belonging to Mrs. Blanchard, also the testimony of Milton Campbell, Esq., as to the execution of the assignment of the various notes and mortgages by Mrs. Blanchard to Benoist and the record of some eight or ten deeds of trust securing notes payable on their face to Mrs. Blanchard. All of this evidence could have been introduced in an action of law upon a demand made under the statutes against the estate of Benoist in the probate court. Certainly the small number of items introduced did not call for an accounting or reference.

In our opinion, upon the evidence and the theory of plaintiff's petition, he had a complete and adequate remedy at law, and it was not at all necessary to have invoked the aid of a court of equity to have obtained full relief, if, in fact, the estate of Joseph Benoist was indebted to Mrs. Blanchard, on account of the matters detailed in evidence.

II.  But we have no method of ascertaining upon what theory the circuit court dismissed the bill, and as the learned counsel on both sides have discussed the case upon its merits, we have examined the testimony in the light of the pleadings.  The allegations of the petition are so general and cover such a long period of time, some twenty-six years, from January 1, 1868, to March 1, 1894, that the defendant can hardly be said to have been notified of what he was to meet, save and except that in a general way the plaintiff, as administrator of Mrs. Blanchard, seeks to recover moneys made from business ventures in which Joseph Benoist was engaged with Joseph and Melvina Blanchard, but when we turn to the testimony, there was no evidence worthy of the name of any joint business venture by Benoist and his sister and her husband.  On the contrary, the evidence tends to show that Benoist alone had established a lucrative business at Baxter Springs, Kansas, as early as 1867, and from that date until he sold out his business, at that point, he was the sole and only owner thereof, and that Mr. Blanchard was employed by him as an assistant or clerk, and that Blanchard became dissatisfied with the wages he received and returned to Canada and remained a year or two and afterwards returned to Kansas, where he died in 1877, without having ever, to the knowledge of any witness in the case, made the slightest claim to an interest in Benoist's business.  Not only was it not shown that Blanchard contributed any capital to the Baxter Springs store, which was in Benoist's name

alone, but the testimony of Mr. Darnall, who was a clerk in that business, establishes that Benoist furnished Blanchard's family a home and supplies, and that Blanchard's principal work was as a mechanic, and that he rendered Benoist his principal services in making repairs as a carpenter upon the three farms, which belonged to Benoist, in that vicinity. Darnall says that Blanchard did not handle any of the goods save now and then when he might happen to be around the store he would assist a little, and that both Blanchard and his wife expressed themselves as dissatisfied with their position there because the wages Blanchard was getting were not enough. Moreover, all the testimony shows that neither Blanchard nor his wife had any considerable property in Canada and the testimony indicates quite conclusively that Blanchard and his wife came to the United States with the hope of bettering their condition financially. In so far, then, as the case rests upon the theory of a partnership or of a joint venture of the common means of Benoist and Blanchard in business, it is without any substantial testimony to support it. Indeed, the argument of the learned counsel for the plaintiff proceeds largely upon the theory that Benoist had voluntarily constituted himself a trustee for Mrs. Blanchard after her husband's death by taking conveyances of real estate in Kansas City in her name, though he paid for the same with his own means and by loaning his moneys on real estate, mortgages and other securities and taking the notes in her name. And the learned counsel earnestly argues that a man of the shrewd business capacity which the evidence shows Benoist to have been, would not have risked such a great proportion of his wealth in the name of his sister, knowing, if she had died with the legal title to these papers in her name, the difficulties he would have encountered in recovering them from her heirs, and that these transactions on his

part stamped upon these papers the character of a trust of which he could not subsequently divest himself. And counsel in aid of this contention call attention to the fact that soon after Benoist had settled in Kansas City he acquired three pieces of real estate and caused the titles to be made to Mrs. Blanchard and then took from her a general power of attorney for the management of the same, but as to the real estate the evidence discloses that, on the 12th of March, 1881, at Benoist's request, Mrs. Blanchard conveyed to him all the real estate in the said three deeds mentioned. Prior to that time, in 1878, he wrote to Mrs. Blanchard that "the properties I have here are in your name and this document [evidently the power of attorney which he had caused her to give him] is to authorize me to act as your agent." And later on after she had conveyed the properties to him, he sent her the insurance policies to assign to him lest in case of fire he might have difficulty in collecting the insurance. In all this large volume of testimony, there is not a word indicating that Mrs. Blanchard ever claimed that she was the owner in fact of said real estate, or that she ever made any claim in all the long correspondence between her and her brother that he was indebted to her in any manner for the purchase money for said lots, which she had conveyed to him at his request. What motive Benoist had in placing his property in his sister's name, we can only conjecture. He was a lone man in the world, his wife and children having died in his early manhood, and the only relatives he had in the world were the half-sisters in Canada, and of these Mrs. Blanchard seems to have been his favorite kinswoman. After having caused the real estate to be conveyed to himself, Benoist continued to loan his accumulations on real estate security and to take the notes in Mrs. Blanchard's name, and it would seem that these notes and their proceeds consti-

tute the basis for the claim of forty thousand dollars, which is now made by Mrs. Blanchard's administrator against Benoist's estate, but while these investments in such large sums were being made by Benoist in his sister's name, in all of the correspondence between them there is nothing indicating that Mrs. Blanchard regarded these moneys or these notes and securities as her own save as she said "if she survived him, she would have a conditional right therein," and as he had doubtless informed her. On the contrary these letters of Mrs. Blanchard to Benoist breathed a most admirable spirit of gratitude on her part for the constant kindnesses which he was showing her by remitting her moneys from time to time for her support and that of her children. If Benoist had in any manner indicated to Mrs. Blanchard that he had invested for her moneys to the amount of twenty thousand to forty thousand dollars, her letters to him are inexplicable. In none of them are to be found demands for rents or interest which would have enabled her to have escaped the hard work which she wrote him she was compelled to do in order to earn her board in her own daughter's home. But over and over again these letters all demonstrate that she regards herself as the object of his bounty, which she again and again touchingly dwells upon. Thus in her letter of January 9, 1881, she says, "And at the same time I have received the fifty dollars, which the letter contained. I was through my work at the end of October. It has been hard for me to ask help of you. I know that you have always been good to me. A thousand thanks for your kindness. I will never forget you." Again and again she besought his kindness and charity to assist her in providing for her children. Out of the three thousand dollars, which he had provided her with which to buy her a home and to support herself, it seems that she gave to her

daughter Azama upon her marriage one thousand dollars and loaned her the further sum of six hundred dollars with which to buy a home. Speaking of this in her letter she said, "The one thousand dollars which you were willing to give her, can be kept by you for me to reimburse me for what I gave her. I hope that you will not get angry, that you are going to retain the same amount for me since you were willing to give them to her; that will reimburse me later." Again she applied to him to aid her other daughter on account of her poverty, and when she desired to have her daughter study music, she applied to him for his consent to do so, and saying that her "own means would not allow her to incur the expense," and about the same time told him that she was through with everything that she had brought from Baxter Springs. But without reproducing these numerous letters all indicating unmistakably that Mrs. Blanchard was a woman without any means save and except those which had been furnished her by Benoist, the conclusion can be stated that they completely refute the theory and contention of the plaintiff that Mrs. Blanchard during all the period of that correspondence entertained the idea that she was the owner of the valuable estate in Kansas City, which her administrator now asserts. In 1883, it seems that Benoist was building some houses in Kansas City, and about that time gave his note to his sister for one thousand dollars and for six years afterwards he paid her six per cent thereon semi-annually, and Mrs. Blanchard's receipts for the same were endorsed on this note, and at the time of Benoist's death, this note was found canceled among his papers. It seems that Benoist made a visit to Canada about 1891, and induced Mrs. Blanchard to return with him to Kansas City, but for some reason she soon concluded to go back to her children. Again, in 1893, she once more returned to Kansas City and was established

McKee v. Allen.

by Benoist in one of his houses, but her health began to fail rapidly and seeing that she must die, Benoist had her assign to him by a general assignment the various notes of his which were in her name. This assignment is assailed by the plaintiff, but the testimony of Mr. Campbell, the notary public who prepared the same and took the acknowledgment thereof, and who was a witness for the plaintiff, affords no basis for the insistence of the plaintiff that Mrs. Blanchard did not understand the full nature of that transaction and that it was not a voluntary act and deed. On the contrary the certificate of the notary is corroborated by the sister of charity, who was present at the time, as well as Mrs. Blanchard's own letters to the effect that Mrs. Blanchard understood English sufficiently well to know the character of the assignment, but not content with this Mr. Campbell testifies that the paper was translated into French and Mrs. Blanchard made fully acquainted with its contents. Much stress is laid in the argument upon the conversation which Joseph Benoist is alleged to have had while in Canada in 1891, at the house of his niece at a dinner at which his sisters and nieces and their husbands were present. Mrs. Archanbault and Mr. Roy testified that Benoist in that conversation said that "Mrs. Blanchard was a woman of means, that she could afford to pay for a good education for her children, that she had forty-five thousand dollars to divide among her three children and her boy would have fifteen thousand dollars, and that if he (Benoist) died first, Mrs. Blanchard would have no trouble, because a Christian Brother in St. Louis would be authorized to settle up everything." But the circuit court must have concluded, as we do, that such statement, resting entirely upon the uncertain memory of witnesses after so long a time, could not be made the basis of a decree or judgment against Benoist's estate for fifteen thousand dollars and in-

terest, when all the facts and circumstances are considered together. It must be borne in mind that Mrs. Blanchard died five years before Mr. Benoist, and that her children and her sons-in-law made no demand upon Benoist for this money, nor took any steps to recover the same or for aught that appears made no inquiry as to the investment of this large sum of money, of which their testimony clearly shows they were in need at the time. Testimony of this character adduced for the first time after the party which it is sought to charge is dead, when there were ample opportunities in his life time to make the claim, is justly regarded with great suspicion by the courts and as entitled to very little weight. We have not been unmindful of the various propositions advanced by the learned counsel for the plaintiff to the effect that a trust in personalty may be established by parol evidence and parol admissions; and that no set form of words is necessary to create a trust, as to dealings between trustee and beneficiary, but all these propositions while recognized and established as they are, must be applied to the facts of a given case and moreover must be based upon proper allegations in the pleadings so as to advise both court and counsel of the claim of the plaintiff. We are wholly unable to agree with the learned counsel that the testimony in this case establishes any trust in Benoist for the benefit of Mrs. Blanchard. On the contrary, we are impressed after a careful reading of the record and a consideration of the relation of Mrs. Blanchard and Mr. Benoist to each other, that all there is to this case is that Benoist in his life time used his half sister's name in his business, and that she recognizing that it was his property and not hers, in her last illness turned back to him the legal title to that which was already his, in order, as she said, "to carry out the true and honest purpose and intent to which I have heretofore held said property." We can-

not escape the conclusion which forces itself upon us that these notes and securities were in fact and in truth the property of Joseph Benoist, which he had accumulated by his own thrift and energy, and it was never his purpose to deprive himself of the beneficial ownership therein as long as he lived; that he did at one time intend to provide liberally for his sisters, and that he did make wills with that object in view, there can be no doubt, but that he ever intended these notes to become irrevocably the property of his sister, we do not believe, nor do we think that his sister, Mrs. Blanchard, ever so thought for one moment. He at all times retained possession of the notes. It was his money that was loaned to the several borrowers. We are asked to declare a trust in all these notes upon the isolated fact that Benoist caused them to be made to Mrs. Blanchard as payee therein. To constitute a trust there must be an explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created. [Young v. Young, 80 N. Y. 438; Beaver v. Beaver, 117 N. Y. l. c. 428 and 430.] In this last-cited case, the Court of Appeals of New York, in a case in which a deposit in the name of another was claimed as a trust for such other, said: "We cannot close our eyes to the well-known practice of persons depositing in savings banks money to the credit of real or fictitious persons, with no intention of divesting themselves of the ownership. It is attributable to various reasons; reasons connected with taxation; rules of the bank limiting the amount which any one individual may keep on deposit; . . . the desire, on the part of many persons, to veil or conceal from others knowledge of their pecuniary condition." To like effect, Getchell v. Bank, 94 Me. 452; Parkman v. Bank, 151 Mass. 218.

III. Error is assigned by the plaintiff to the exclusion of the writing identified as exhibit "P" in the

record, being the same already copied in the statement, and which refers to the Canadian, Magnan, and in which occurs this sentence, "Should I happen to die suddenly, you may write to him and he would give you the information to help you recover your moneys I have lent in your name, and which to-day amount to over twenty thousand dollars. Signed, Joseph Benoist." When this paper was offered, counsel for the defendant objected to its admission in evidence, first, because there was not sufficient proof of the signature of Benoist to it, and, secondly, that it is only the fragment of a paper. It was not addressed to any person and bore no date, and there was absolutely no evidence as to what the missing parts were. The court sustained this objection. As this paper was not directed to Mrs. Blanchard and bore no date and confessedly only purported to be a fragment of some other writing, and with no evidence that any person had ever seen the complete writing or what it referred to, or what it contained, we are of the opinion that no error was committed in excluding it. The cases cited by learned counsel for the plaintiff where only a portion of a complete instrument is offered and the opposite party has the privilege of offering all the balance of the document if he so desires, do not meet the objection alleged against this paper, neither is the case of an accidentally defaced paper in point. The difficulty here is that no one can say to whom this paper was directed, if to any one, or in what connection it was written, or what the context of the paper was or its date. We think it was properly excluded.

There are other propositions as to the exclusion of evidence, such as a marriage settlement and the citizenship papers, but their exclusion could not in any event affect the real merits of the case.

Having given the case our best consideration, we are of the opinion that the judgment of the circuit

court was correct, first, on a technical ground, that the plaintiff's remedy, if any, was by the presentation of the claim or demand against the estate of Joseph Benoist in the probate court, and, second, that upon the evidence the circuit court correctly held that the plaintiff did not make out the case stated in his petition, and, third, that plaintiff established no such trust relation as plaintiff seeks to maintain in his argument and brief in this court, but that if he had, such claim is contradictory of that asserted in his petition. The judgment of the circuit court finding the issues for the defendant and dismissing plaintiff's bill is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.